UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JESSICA MAHER,

                           Plaintiff,                   **MEMORANDUM & ORDER**

    -against-                               06 CV 5073  (DRH) (ARL)

ALLIANCE MORTGAGE BANKING
CORP. and RAYMOND AGOGLIA,

                           Defendants.
--------------------------------------------------------X
**APPEARANCES:**

**REISMAN, PEIREZ & REISMAN, LLP**
Attorney for Plaintiff
1305 Franklin Avenue
P.O. Box 119
Garden City, New York 11530
By: E. Christopher Murray, Esq.

**FRANKLIN, GRINGER & COHEN, P.C.**
Attorney for Defendant Raymond Agoglia
666 Old Country Road, Suite 202
Garden City, New York 11530
By: Joshua Marcus, Esq.

**HURLEY, Senior District Judge:**

## INTRODUCTION

        Plaintiff Jessica Maher ("Plaintiff") commenced this employment discrimination

action against defendants Alliance Mortgage Banking Corporation[1] ("Alliance") and Raymond

---

        [1]By Order, dated June 13, 2008, the answer of defendant Alliance was stricken because
Alliance had discharged its attorney and declined to obtain new counsel.  (Order, dated June 13,
2008.)  Plaintiff then moved for an entry of a default judgment against Alliance, which was
granted on July 2, 2008, and the action was referred to U.S. Magistrate Judge Arlene R. Lindsay,
pursuant to 28 U.S.C. § 636(b)(3), for an inquest on damages and attorney's fees.  (Order, dated
July 2, 2008.)  Magistrate Judge Lindsay issued a Report and Recommendation on January 8,
2009 that the inquest of Alliance be deferred until the Court reaches final adjudication of
Plaintiff's claims against defendant Agoglia, which was adopted in its entirety on March 13,
2009.  (Order Adopting Report and Recommendation, dated March 13, 2009.)

Agoglia ("Agoglia" or "Defendant") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et. seq. ("Title VII"), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and New York common law, asserting claims of a hostile work environment and retaliation, as well as common law causes of action for intentional infliction of emotional distress and assault. Presently before the Court is the motion by defendant Agoglia for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are construed in the light most favorable to Plaintiff, the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005).

### A.    *Plaintiff's Initial Employment with Alliance*

Alliance was a mortgage banking company, located in Levittown, New York, that was in business from 1984 to June 22, 2007.[2] (*Marcus Aff.*, filed September 10, 2008 ("*Marcus Aff.*") at ¶ 2, Ex. A at 6, 9-10.) Defendant began working for Alliance in 1984, first as a loan officer and thereafter as a Sales Manager/Vice President (*Id.*, at 8; ¶ 4; Ex. C at 6-7.)   In his position as a Sales Manager/Vice President, Defendant supervised approximately twelve loan

---

[2]On June 22, 2007, Alliance terminated all employees except its President, John Murphy ("Murphy") and its Human Resources Director, Ellen Spaventa. (*Id.*)  Murphy is the sole owner, shareholder, director and member of Alliance's Board of Directors. (*Id.*, at 6-7.)

officer employees, including Plaintiff's father, Ronald Maher.[3]  (*Id.* ¶ 4, Ex. C at 8; (*Murray Aff.*, dated August 25, 2008 ("*Murray Aff.*") at ¶ 4, Ex. B at 70.)

Plaintiff was employed by Alliance from March 2002 to November 2005. (*Marcus Aff.* at ¶ 5, Ex. D at 7-8, 121.)  Prior to July 2004, while attending high school, Plaintiff worked in the Shirley, New York office for Alliance as a part-time office worker and reported to her father Ronald Maher.  (*Id.*, at 8.)  After graduating high school in July 2004, Plaintiff was offered and accepted a full time position in the branch accounting department at Alliance's corporate headquarters in Levittown, New York.  (*Id.*, at 11-14; *Murray Aff.* at ¶ 7, Ex. E at ¶ 7.)

In March 2005, Plaintiff reported to the supervisor of the accounting department, Michelle Bello ("Bello").  (*Marcus Aff.* at ¶ 5, Ex. D at 18-19.)  Due to performance issues, Maher was transferred to a data entry position in the bookkeeping department at Alliance's Levittown, New York office in June 2005.  (*Id.* at 23-24.)  As part of her new duties, Plaintiff was responsible for covering the receptionist's main desk for one hour each day when the receptionist took her lunch break.  (*Id.* at 16.)

## B.    *Defendant's Alleged Conduct*

Plaintiff alleges that beginning in October 2004 through September 2005, the following incidents occurred:

---

[3]Ronald Maher opened the branch office of Alliance in Shirley, New York and was in charge of production of business for that office.  (*Murray Aff.* at ¶ 5, Ex. C at 16-17; ¶ 7, Ex. E at ¶ 6; ¶3, Ex. A at 14-15.)

In October 2004,[4] Plaintiff attended an Alliance Halloween party dressed as a punk schoolgirl with black fishnet stockings. (*Id.* at 38-39.) While Plaintiff was walking down the hallway, Defendant approached her and requested that she come into his office, close the door and sit down. (*Id.* at 39.) Defendant then asked Plaintiff if her stockings were waist-high or thigh-high and also wanted to see how far they went up her leg. (*Id.*) Plaintiff told him that they were not thigh-highs and he laughed. (*Id.* at 40.) After leaving his office, Plaintiff told two co-workers, Tammy Kose and Kerry Aozzopardi about the encounter. (*Id.* at 40-41.)

In February 2005, while hanging Valentine's decorations in the office, Defendant approached Plaintiff from behind and smacked her buttocks three times with a cupped hand while saying, "Hey, hey, hey." (*Id.* at 46-48.) Plaintiff told him to stop. (*Id.*) Plaintiff then told a co-worker, Salvatore Guirlanda, about the incident. (*Id.* at 47-48.)

In April 2005, while Plaintiff was sitting in the reception area, Defendant approached her from behind and rubbed her shoulders and neck. (*Id.* at 160-61.) She asked him to stop, he refused, she squirmed out of his grip, and he walked away. (*Id.*)

In May 2005, while Plaintiff was in a co-worker's office, Defendant again approached her from behind and pinched her buttocks. (*Id.* at 53-56.) When Plaintiff told him to stop, he laughed and inquired whether she would press sexual harassment charges against him if she left Alliance. (*Id.*) Plaintiff informed him that she would if he did not stop what he was

---

[4]Plaintiff's Complaint alleges that this incident took place on October 29, 2005. (Compl. ¶ 17.) Plaintiff testified at her deposition, however, that the incident actually occurred in October 2004 and produced notes drafted to her initial attorney that indicated that the incident occurred in October 2004. (*Marcus Aff.* at ¶ 5, Ex. D at 39-40; ¶ 10, Ex. I, at 3.)

doing.  (*Id.*)  Later that afternoon, Plaintiff told a co-worker Jeany about the encounter.  (*Id.* at 56-57.)

In addition, at various times during this period, Defendant questioned Plaintiff about her relationship with her boyfriend and told her that if she was not serious with him, Plaintiff could go on vacation with Agoglia.  (*Id.* at 61-64.)  One time, Defendant asked her to go to Greece[5] with him.  (*Id.* at 64)  When Plaintiff declined his invitation, stating that she could not take off from work, Defendant allegedly told her, "I am Alliance, so you can get off if I say you can get off."  Plaintiff told him that she would not go on vacation with him.  (*Id.* at 64.)

In July 2005, while sitting in the reception area, Defendant came towards Plaintiff gesturing his hands as if he were going to grab her breasts.  (*Id.* at 66.)  She asked him to stop and reminded him that he had a daughter who was approximately her age.  (*Id.* at 66-67.)   He responded by telling her that she knew how to shut him up.  (*Id.*)  Later that day, Plaintiff told two co-workers, Tammy and Kerri about the incident.  (*Id.*)

Thereafter, in mid-July 2005, at a fiftieth birthday party for Agoglia which was being held at a restaurant in Manhattan, New York, Plaintiff approached Bello, her supervisor, and informed her of Defendant's behavior towards her.  (Compl. ¶ 20; *Marcus Aff.* at ¶ 5, Ex. D at 71-75).  At the party Plaintiff did not go into the details of each incident but told Bello that he had touched her on more than one occasion and had spoken to her in a manner that made her feel uncomfortable.  (*Id.*)

_____

[5]Plaintiff stated in her Affirmation that one time Defendant asked her if she would go to Mexico on vacation with him.  (*Murray Aff.* at ¶ 7, Ex. E at ¶ 17-18.)

Bello told her to avoid Defendant as much as possible, to tell him to stop, and that she would look into it. (*Id.*; *Marcus Aff.* at ¶ 7, Ex. E at ¶ 20)  A few days later, on July 18, 2005, Plaintiff again spoke to Bello at the office, repeated the concerns she had about Defendant's conduct and asked her what was going to happen with regard to her complaint about Defendant's actions. (*Id.* at ¶ 21;  *Marcus Aff.* at ¶ 7, Ex. E at ¶ 21 and ¶ 5, Ex. D at 75.)   Bello repeated that Plaintiff should avoid him as much as possible.  (*Id.*)

On September 16, 2005, while in the reception area, Defendant walked behind Plaintiff and swatted her buttocks three times with a rolled up bunch of newspapers and said, "It was there.  I couldn't help myself." (*Marcus Aff.* at ¶ 5, Ex. D at 69.)  Approximately fifteen minutes later, while lighting a candle by her desk, Defendant came near her and blew in her ear, laughed and then swatted her buttocks.  (Compl. at ¶¶ 14-15.)

On another occasion during this period, Defendant approached Plaintiff and told her about a bachelor party he had attended the night before.  (*Murray Aff.* at ¶ 7, Ex. E at ¶ 24.) During that conversation, Defendant allegedly told her that he had seen several hot, naked, blonde women, and he thought that Plaintiff had been one of them.  (*Id.*)

On September 28, 2005,[6] while on the telephone with a customer at the main reception desk, Defendant placed an unlit cigar down the front of Plaintiff's blouse, grazing her breast as he did it (the "September 2005 Incident").  (*Marcus Aff.* at ¶ 5, Ex. D at 108-09.)  Then Defendant laughed and told her that he did not smoke anymore and wanted to put the cigar in a place he liked.  (*Id.* at 110.)

---

[6]Plaintiff asserts in the Complaint that this event occurred on September 22, 2005, but testified at her deposition that the incident occurred on September 28, 2005.  (Compl. ¶ 16.)

### C. Factual Background Following the September 2005 Incident

Later that same day, on September 28, 2005, Plaintiff told her father about the September 2005 Incident and Defendant's prior actions. (*Id.* at 111-12.) Her father telephoned her grandfather, a former police officer, who advised them to report the conduct to the Nassau County Police Department. (*Id.* at 111-12.) Plaintiff then filed a complaint against Agoglia alleging, inter alia, that he had assaulted her. (*Id.*)

In addition, Plaintiff wrote to Bello on September 28, 2005, following up on her July 15, 2005 and July 18, 2005 complaints about Defendant's conduct and inquiring into what actions had been taken to end his continued "sexual misconduct" towards her. (*Id.* at 112-13; *Murray Aff.* at ¶ 8, Ex. F.) Bello told Plaintiff that she was unaware that Plaintiff had wanted her to speak to anyone about the complaints, and thereafter delivered the letter to Ellen Spaventa, Alliance's Human Resource Director. (*Marcus Aff.* at ¶ 5, Ex. D at 113-15.) Spaventa met with Plaintiff and discussed her complaints about Defendant. (*Id.* at 115-16.) Spaventa told her that she would speak to Defendant and that she would make sure Agoglia apologized. (*Id.* at 116.) Later on September 28, 2005, in the presence of Bello, Defendant told Plaintiff that to the extent he may have offended her, he wanted to apologize. (*Id.* at 118-19.)

On November 3, 2005, Plaintiff gave notice that she was resigning her employment with Alliance effective November 17, 2005. (*Id.* at 121.)

The Nassau County Police Department arrested Defendant on November 15, 2005 in connection with Plaintiff's criminal assault claim.[7] (*Id.* at 131-32.) Later that day, Spaventa

---

[7] Agoglia was arrested and charged with numerous misdemeanor counts which are still pending. (*Murray Aff.* at ¶ 7, Ex. E at ¶ 32, Ex. D.)

informed Plaintiff that she was being let go two days early but would be paid for those two days. (*Id.* at 136-37.) Alliance paid Plaintiff through her last scheduled day of work, November 17, 2007. (*Id.* at 138.)

### D. Procedural Background

In January 2006, Plaintiff filed a charge of employment discrimination with the United States Equal Employment Opportunity Commission ("EEOC") through a joint filing with the New York States Division of Human Rights. Plaintiff was granted a Notice of Right to Sue on August 1, 2006.

Plaintiff commenced the instant action on September 19, 2006. Her Complaint asserts the following claims: (1) violations of Title VII; (2) violations of the NYSHRL; (3) and common law causes of action for intentional infliction of emotional distress and assault.

Defendant Agoglia now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## DISCUSSION

### I. Applicable Law and Legal Standards

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's

burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Board of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

## II.     *Plaintiff's Title VII Claim Against Defendant Agoglia*

It is well-settled that unlike employers, "individuals are not subject to liability under Title VII." *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (internal

quotation marks and citation omitted); *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir. 1995) ("individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"), *abrogated on other grounds by Burlington Indus.,Inc. v. Ellerth*, 524 U.S. 742 (1998); *see also Moultrie v. VIP Health Care Servs.*, No. 08-CV-0457 (DLI), 2009 WL 750219, at *3 (E.D.N.Y. Mar, 19, 2009) (same).

   Although Plaintiff does not dispute that there is no individual liability under Title VII, she argues for the first time in her opposition papers that because Agoglia "freely employed Alliance's personnel, including [P]laintiff, to conduct his private affairs, including his business of constructing homes, with the full knowledge and consent of Alliance, and no records were kept as to who did what,"Agoglia was her "employer" for purposes of Title VII. (Pl.'s Mem. of Law in Opp. at 16.) Plaintiff's argument is unavailing.

   A review of the record indicates that while Agoglia owned a few companies and had employed Plaintiff's father, Ronald Maher, and other Alliance employees, there is no evidence that Agoglia ever employed Plaintiff in any of those entities. (*Murray Aff.* at ¶ 4, Ex. B at 60-61, 64-67.) Neither her Complaint nor her resume asserts or states that Plaintiff worked for Agoglia or was employed in any of the companies in which he had an ownership interest. (Compl.; *Marcus Reply Aff.*, dated September 10, 2008, Exs. A-C.) Moreover, the sole reference that Plaintiff worked for Agoglia was based on her testimony that when she filled in as a receptionist at Alliance, Defendant had asked her on occasion to contact her father. (*Marcus Aff.* at ¶ 5, Ex. D at 17-18.) According to Plaintiff, this occurred between five to ten times during the course of her employment with Alliance. (*Id.*) Significantly, however, Plaintiff did not testify that the telephone calls were made in furtherance of Agoglia's companies nor did she

state that she had received any payment from any of Agoglia's businesses for such services. (*Id.*) Finally, the Court notes that the allegations of misconduct that Plaintiff complains of occurred at the Levittown Alliance office where she and Defendant were employed in different departments. Apart from her conclusory statement in her opposition papers, Plaintiff has not presented sufficient evidence for a trier of fact to conclude that Agoglia was her employer. *See Gottlieb*, 84 F.3d at 518. Accordingly, in light of the foregoing, Defendant's motion for summary judgment on Plaintiff's Title VII cause of action is granted.

### III.    Plaintiff's NYSHRL Claims Against Defendant Agoglia [8]

Discrimination and retaliation claims brought under the NYSHRL are evaluated identically to claims brought under Title VII. *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997) (acknowledging that claims brought under the NYSHRL are analytically identical to claims brought under Title VII); *see, e.g., Ferrante v. American Lung Ass'n,* 90 N.Y.2d 623, 629-30 (1997) (relying on Title VII case law to interpret the NYSHRL). However, New York law differs from federal law in one notable respect: unlike Title VII, the NYSHRL allows the imposition of liability on individual employees in limited circumstances; thus, the Court's dismissal of Plaintiff's Title VII claim is not necessarily dispositive of the corresponding state-based statutory cause of action. *See Feingold v. New York*, 366 F.3d 138, 156-59 (2d Cir. 2004); *Tomka*, 66 F.3d at 1317. An individual defendant may be held liable for discrimination under two provisions, to wit, § 296(1) and 296(6).

---

[8]Defendant requests that if this Court should dismiss Plaintiff's Title VII claim against Agoglia, that the supplemental state law claims be dismissed as well. Inasmuch as the Court retains jurisdiction over the default judgment entered against defendant Alliance, Defendant's request is denied.

*(A)*      *Section 296(1)*

A supervisor may be subject to personal liability under § 296(1) of the NYSHRL where such individual has been deemed an "employer" for purposes of the NYSHRL. Under § 296(1), it is an unlawful discriminatory practice

> for an employer or licensing agency, because of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, . . . to bar or discharge from employment such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law § 296(1)(a) (McKinney 2005). The New York Court of Appeals has held that an individual supervisor can only be held liable as an "employer" pursuant to § 296(1) where he or she is "shown to have an ownership interest in [the business employing the plaintiff] or power to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 542 (1984) (per curiam); *Tomka,* 66 F.3d at 1317 (same) (citing *Patrowich*). The factors a court may consider under the second prong set forth in *Patrowich* include whether the individual "(1) had the power to hire or fire employees, (2) supervised and controlled employee work schedules or employment conditions, (3) determined the rate and methods of payment, and (4) maintained employment records." *Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 517 (N.D.N.Y. 2004); *see Herman v. RSR Sec. Servs., Ltd.,* 172 F.3d 132, 139 (2d Cir. 1999).

Applying this standard, and for the reasons discussed above, Plaintiff has not proffered evidence that Defendant was her employer. While Plaintiff states in her opposition papers that after allegedly asking Agoglia's permission, her father had hired her to work in the Shirley branch office of Alliance, she has not set forth any evidence that Defendant had the authority to fire her or to control her schedule or to determine her salary. (Pl.'s Mem. of Law in

Opp. at 4.)  The record is clear that Plaintiff and Defendant were employed in different departments at the Levittown branch office of Alliance.  Further, although Agoglia was a Sales Manager/Vice President of Alliance, there is no evidence that Defendant was her supervisor or had an ownership interest in Alliance or had the power to make personnel decisions concerning Plaintiff's employment, such that a reasonable juror could conclude that Agoglia was Plaintiff's "employer." The fact that Agoglia may have had supervisory control over Plaintiff's father and other employees at Alliance or that Ronald Maher may have sought his permission to hire Plaintiff, without more, does not subject Defendant to liability under § 296(1).  *See Tomka,* 66 F.3d at 1317; *Lewis v. Triborough Bridge and Tunnel Auth.*, 77 F. Supp. 2d 376 (S.D.N.Y. 1999).   Accordingly, § 296(1) does not provide an appropriate ground upon which to hold Defendant personally liable under the NYSHRL.

> ### *(B)      Section 296(6)*

Section 296(6) of the NYSHRL "provides a broader source of personal liability." *Perks v. Town of Huntington,* 251 F. Supp. 2d 1143, 1160 (E.D.N.Y. 2003).   An individual defendant may be personally liable for discrimination under the aid-or-abet provision of the

NYSHRL.[9]  *See* N.Y. Exec. Law § 296(6); *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir.

2004).  Under § 296(6), it is an unlawful discriminatory practice

> for any party to aid, abet, incite, compel or coerce the doing of any
> of the acts forbidden under this article, or to attempt to do so.

N.Y. Exec. Law § 296(6).

The Second Circuit has construed this language to mean that "a defendant who

actually participates in the conduct giving rise to a discrimination claim may be held personally

liable as an aider and abettor under the NYSHRL, even though the defendant has neither an

ownership interest nor the power to hire or fire."  *Perks,* 251 F. Supp. 2d at 1160 (quoting

*Tomka,* 66 F.3d at 1317) (internal quotation marks omitted).  In addition, the Second Circuit has

further interpreted this provision to allow "a co-worker who 'actually participates in the conduct

giving rise to a discrimination claim' to be held liable under the NYSHRL" irrespective of

whether that co-worker had authority to make personnel decisions.  *Feingold*, 366 F.3d at 158

(quoting *Tomka,* 66 F.3d at 1317 n.19).[10]

---

[9]In his opposition papers, Defendant concedes that an individual can be held liable pursuant to the NYSHRL § 296(6) as an aider and abettor, but argues that he is entitled to summary judgment because Plaintiff did not allege an aider or abettor theory in the Complaint. (Def. Mem. of Law in Supp. at 14.)  It is well-settled that as long as a complaint "gives full notice of the circumstances giving rise to . . . [her] claim for relief," the complaint "need not also correctly plead the legal theory or theories and statutory basis supporting the claim."  *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 712 n.4 (2d Cir. 1980); *see also Albert v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim.  Factual allegations alone are what matters.").  Here, the Complaint cites Executive Law § 290 *et seq.*  and gives adequate notice that Plaintiff seeks to hold Agoglia individually liable under New York State law for subjecting her to an allegedly hostile work environment.  (*See* Comp. ¶¶ 33-35.)  Accordingly, the Court declines to grant Defendant summary judgment on this basis.

[10]In *Feingold*, the Second Circuit recognized that "[t]hough state courts are not in unanimous agreement with this aspect of our decision in *Tomka* [finding personal liability if an employee participates in conduct giving rise to a discrimination claim], the majority of courts

In applying these principals to the case at hand, the Court must first decide whether Agoglia may be considered an "aider and abettor" of his own conduct under § 296(6). Plaintiff alleges that Agoglia acted as an aider and abettor under § 296(6) by engaging in the discriminatory conduct that produced a hostile work environment. Relying on *Hicks v. I.B.M.*, 44 F. Supp. 2d 593, 600 (S.D.N.Y. 1999)[11], Defendant counters that, as the sole person who committed the allegedly unlawful acts, he cannot be held liable under § 296(6) for aiding and abetting his own actions.

Recently, a court in this district addressed the issue of whether an individual could aid and abet his own discriminatory acts for purposes of personal liability under § 296(6), and based upon Second Circuit precedent, rejected the test for individual employee liability set forth in *Hicks*. *See Tully-Boone v. North Shore-Long Island Jewish Hosp. Sys.*, 588 F. Supp. 2d 419, 427 (E.D.N.Y. 2008). In *Tully-Boone,* the court stated:

> certain [c]ourts have cast doubt on the Second Circuit's interpretation of § 296(6) in *Tomka* . . . . As one [c]ourt noted, the *Tomka* formulation of the statute creates a strange and confusing circularity where the person who has directly perpetrated the [unlawful discrimination] only becomes liable through the employer whose liability in turn hinges on the conduct of the direct perpetrator. Confronted with an argument identical to the one made by [defendant] here, [in *Perks v. Town of Huntington*, 96 F.

---

that have considered the issue have affirmed the existence of a cause of action against individual defendants under the aid-or-abet provision of the NYSHRL." 366 F.3d at 158 n. 19 (collected cases omitted).

[11]In *Hicks*, the court dismissed a claim of race discrimination against an individual supervisor who allegedly was the primary actor in the discriminatory conduct. *Id.* The court concluded that he "stands in a different place" than the other supervisory personnel who failed to address plaintiff's complaints because he was "alleged to have committed, and incited other unnamed employees to commit, the very discriminatory acts that are at issue here." *Id.* The court dismissed the § 296(6) claim against him, "on the theory that the primary actor cannot be an aider and abettor of his own actions." *Id.*

Supp.2d 222, 228 (E.D.N.Y. 2000),] the late Judge Jacob Mishler offered a useful analysis of the logical problem presented by the Second Circuit's interpretation of § 296(6):

> Defendant argues that she should not be found liable as an aider and abetter because she could not have aided and abetted her own acts. *See also Hicks v. IBM,* 44 F. Supp. 2d 593, 600 (S.D.N.Y. 1999). The Second Circuit apparently disagrees. In *Tomka*, plaintiff alleged that each of the individual defendants assaulted her and thereby created a hostile work environment. 66 F.3d at 1317. The court held that that allegation was sufficient to satisfy § 296(6) [HRL's aiding and abetting statute]." *Id.* Perhaps the rationale behind the court's decision was that each of the three individuals were aiding and abetting their own violations of the HRL. Perhaps the rationale behind the decision was that the employees' actions imposed liability on the employer and therefore the employees were aiding and abetting the employer's violation of the HRL and not their own. We must wait for the Second Circuit to revisit the issue so that we may gain a firmer understanding of its rationale in *Tomka* and better understand the intended breadth of its application.

> *Id.*

> The Court is mindful that the *Tomka* interpretation of § 296(6) is not without controversy. Nevertheless, until the Second Circuit revisits the issue, *Tomka* is the law in this circuit. Accordingly, [defendant] may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even where her actions serve as the predicate for the employer's vicarious liability.

588 F. Supp. 2d at 427 (quoting and discussing *Perks*, 96 F. Supp. 2d at 228) (internal quotation marks and citations omitted); *see also Salvatore v. KLM Royal Dutch Airlines,* No. Civ 98-2450 (LAP), 1999 WL 796172, at *8 (S.D.N.Y. Sept. 30, 1999) (allowing a § 296(6) claim to stand against the sole employee who participated in the discriminatory acts).

This Court accepts as it must the interpretation of § 296(6) set forth in *Tomka*, declines to follow *Hicks,* and likewise holds that until the Second Circuit revisits this issue, an individual may be liable under § 296(6) for aiding and abetting an unlawful discriminatory practice of his employer even where his conduct serves as the sole predicate for the employer's liability.  *See, also, Lewis,* 2001 WL 46986, at *2 (declining to follow *Hicks* and stating that "this Court follows the majority of decisions in this district in recognizing that an individual can be liable for aiding and abetting his own discriminatory conduct"); *Salvatore,* 1999 WL 796172, at *8 (declining to dismiss claims against individual defendant pursuant to § 296(6) where the defendant was "the sole KLM employee alleged to have engaged in the discriminatory conduct").  On this basis, that Court recognizes that, because Plaintiff's complaint is replete with assertions that Agoglia "actually participated" in the alleged discriminatory conduct that produced the alleged hostile work environment at Alliance, Defendant may be held liable for aiding and abetting his own conduct under § 296(6).

### (C)    *Claims Under Section 296(6)*

The Complaint asserts a hostile work environment claim and a retaliation claim against defendant Agoglia (and defendant Alliance)[12] pursuant to NYSHRL.[13]  For the sake of clarity the Court will address each of Plaintiff's § 296(6) claims separately.

---

[12]Plaintiff alleges that Alliance, acting through Defendant Agoglia, violated the NYSHRL by failing to take action when Plaintiff reported Agoglia's sexual harassment and thereby tolerated a hostile work environment.  (Pl.'s Mem. of Law in Opp. at 19.)

[13]In her opposition papers, Plaintiff appears to pursue only her hostile work environment claim against Agoglia pursuant to the NYSHRL.  *See* discussion *infra.*

### (1)    Hostile Work Environment

Title VII provides that "[it] shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a).  One form of employment discrimination on the basis of sex that is prohibited by Title VII is sexual harassment that results in a "hostile or abusive work environment."  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986); *see Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)) ("Title VII creates a cause of action based on the presence of a hostile working environment when the workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment. . . .").

To establish a hostile work environment claim, a plaintiff must prove "[1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer."  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).  The plaintiff must "show that the complained of conduct: (1) 'is objectively severe or pervasive - that is, creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's sex.'"  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)).  "This test has objective

and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano* 294 F.3d at 374 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

In analyzing a plaintiff's case, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Id.* (citing *Harris*, 510 U.S. at 23). Relevant factors include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). "But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374 (citing *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) and *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999)).

As the Second Circuit has noted on more than one occasion:

> While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.' " (alteration and emphasis in the original).

> *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir.2003) (quoting *Whidbee v. Garzarelli Food Specialties, Inc*., 223 F.3d 62, 70 (2d Cir.2000)).

> "The environment need not be 'unendurable' or 'intolerable.' " *Id.* In brief, "the fact that the law requires harassment to be severe or pervasive before

> it can be actionable does not mean that employers
> are free from liability in all but the most egregious
> cases." *Id.* (quoting *Whidbee*, 223 F.3d at 70
> (internal quotation marks omitted)).

*Feingold*,  366 F.3d at 150.

### (a)    *Severe or Pervasive Discriminatory Harassment*

Defendant argues principally that summary judgment should be granted in his favor because the allegations of Agoglia's conduct, even if true, do not rise to the level of an actionable hostile work environment.  The Court disagrees.

Viewing the record as a whole, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Alfano*, 294 F.3d at 374, the Court finds that a reasonable jury could conclude that the conduct to which Plaintiff claims she was subjected created a hostile work environment based on her sex. Plaintiff has put forth evidence that from October 2004 through September 2005, she was subjected to a steady stream of unwelcome, escalating sexual harassment that included "physical assault and continuous sexual intimidation."  (Pl.'s Mem. of Law in Opp. at 9.)  During this period, Plaintiff asserts that Agoglia made repeated sexual comments to her, which included asking her how far her stockings went up her leg, asking her about her relationship with her boyfriend, asking her to go on vacation with him, commenting that he could not help himself when he had smacked her buttocks with a newspaper because "it was there", telling her that he thought she was one of the "hot, naked, blonde women" at a bachelor party he had attended, and telling her (when he had placed a cigar down her blouse) that he had wanted to put the cigar "in a place he liked."

Plaintiff further asserts that Agoglia had engaged in unwelcome sexual contact toward her, which included smacking and/or grabbing her buttocks on numerous occasions, blowing into her ear, rubbing her shoulders and neck, making motions which indicated that he would grab her breasts, grazing her breast with his hand, and placing a cigar down her blouse. Some of these encounters, as described by Plaintiff, may be sufficiently severe on their own to support her claim, and when analyzed in light of the sexual comments and other innuendos, if credited by a jury, would support a finding of a hostile work environment. A jury considering the totality of the circumstances could reasonably find Agoglia's actions were frequent, humiliating, and altered the conditions of her employment.

Finally, because the nature of many of these incidents are sexually-related on their face, it cannot be said that for purposes of surviving summary judgment the Plaintiff has failed to put forth sufficient evidence that these actions are related to her gender to support her claim. Accordingly, viewing the record in the light most favorable to Plaintiff, the non-moving party, the Court concludes that Plaintiff has proffered sufficient evidence upon which a reasonable juror could find that Plaintiff was subjected to a workplace permeated with discriminatory harassment which was sufficiently severe or pervasive as to alter the conditions of her work environment.

(b)     *Basis for Imputing Agoglia's Alleged Conduct to Alliance*[14]

Where, as in the instant matter, the alleged harasser is a co-worker rather than a supervisor, an employer may be held liable where it "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal quotation marks and citation omitted).  In such a case, summary judgment is precluded where a jury could reasonably find that the employer, "in the exercise of reasonable care, knew or should have known about the co-worker harassment faced by [Plaintiff], yet failed to take appropriate remedial action."  *Fairbrother v. Morrison*, 412 F.3d 39, 52 (2d Cir. 2005) (internal quotation marks and citation omitted); *see Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998) (holding in cases of co-worker harassment, an employer "will be liable only for its own negligence"); *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) ("An employer who has notice of a discriminatorily abusive environment in the workplace has a duty to take reasonable steps to eliminate it.").  Further, where "the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate."  *McArdle v. Arms Acres, Inc.*, No. 03 Civ. 05721 (PGG), 2009 WL 755287, at *9 (S.D.N.Y. Mar. 23, 2009) (internal quotation marks and citation omitted) (acknowledging that "this precedent is in accordance with

---

[14]Plaintiff maintains that because a judgment as to liability against defendant Alliance has already been granted upon default, "Agoglia cannot now argue that Alliance did not violate Title VII and New York State's Executive Law."  (Pl.'s Mem. of Law in Opp. at 14.)  "Nevertheless, even where there is a default a district court must determine whether the allegations in the complaint state a claim upon which relief may be granted."  *Mendez v. Nooch, Inc.*, No. 07 Civ. 11174 (LLS), 2009 WL 666771, at *1 (S.D.N.Y. Mar. 6, 2009) (internal quotation marks and citations omitted); *see also Choi v. Kim*, No. 04-CV-4693, 2006 WL 3535931, at *4 (E.D.N.Y. Dec. 7, 2006).  Thus, for purposes of defendant Agoglia's summary judgment motion, the Court will examine whether there is a basis upon which his conduct may be imputed to defendant Alliance.

the EEOC's guidelines, which provide that: 'with respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action'") (quoting 29 C.F.R. 1604.11(d)).

Defendant maintains that Alliance cannot be held liable for his conduct because pursuant to Alliance's Handbook for Employees (the "Handbook") and sexual harassment policy, Plaintiff failed to utilize the complaint procedure set forth in the Handbook and notify the two persons identified in the policy, Alliance's Human Resources Manager, Ellen Spaventa, or the VP of National Operations, Sal Finnoccio. The Court disagrees.

The undisputed evidence shows that Alliance had a written sexual harassment policy contained in its Handbook for Employees, date-stamped June 2005, which Plaintiff acknowledged she received on June 24, 2005. (*Marcus Aff.* at ¶ 11, Ex. J at 26, 30.) The Handbook provides in pertinent part:

> The Company is committed to providing a work environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive, or disruptive, including sexual harassment. . . .
>
> Sexual harassment is defined as unwanted sexual advances, or visual, verbal, or physical conduct of a sexual nature. . . .
>
> Unwelcome sexual advances (either verbal or physical) . . . and other verbal or physical conduct of a sexual nature constitute sexual harassment when . . . the conduct has the purpose or effect of interfering with work performance or creating an intimidating, hostile, or offensive work environment.

> If you experience or witness sexual or other unlawful harassment
> in the workplace, report it immediately to the Human Resources
> Manager . . . or the VP of National Operations . . . .
>
> All allegations of sexual harassment will be quickly investigated. .
> . . *Any supervisor or manager who becomes aware of possible*
> *sexual or other unlawful harassment must immediately advise the*
> *Human Resources Manager or the VP of National Operations so it*
> *can be investigated in a timely manner.*

(*Id* at 26) (emphasis supplied.)  In addition, in its "Suggestions" section, the Handbook states,

inter alia, "Employees are encouraged to discuss any work-related suggestions or problems with

your supervisor." (*Id* at 29.)

      While it is true that Plaintiff did not report or identify Defendant's conduct to the

Human Resources Manager or the VP of National Operations identified in the Handbook, the

record does reveal that Plaintiff did discuss her "problems" with Agoglia to her direct supervisor,

as "encouraged" in the Handbook.   The evidence indicates that on July 15, 2005, Plaintiff first

complained to her direct supervisor, Bello, about Agoglia's actions and told her that Agoglia had

touched her on more than one occasion and had spoken to her in a manner that made her feel

uncomfortable.  Bello purportedly told Plaintiff to avoid Agoglia, to tell him to stop, and that she

would look into it.  While Defendant's supporting papers assert that Bello was unaware that

Plaintiff had wanted her to disclose their conversation with anyone at the company, the evidence

shows that Plaintiff again spoke to Bello a few days later at the office, on July 18, 2005, repeated

her concerns about Defendant's conduct and questioned Bello about what action would be

taken.[15]  Under such circumstances, Bello was required under the mandates of the Handbook to

---

[15]Allegedly, Bello merely told Plaintiff to avoid Agoglia.

immediately advise the Human Resources Manager or VP of National Operations of the possible unlawful harassment.

Here, a jury could reasonably find that Bello, Plaintiff's direct supervisor, knew as of July 15, 2005, that Agoglia had engaged in unwelcome physical and verbal conduct that was sexual in nature. When Plaintiff followed up on her initial conversation with Bello in her office on July 18, 2005, a jury might also reasonably conclude that Agoglia's conduct toward Plaintiff might rise to the level of creating a hostile work environment. The record shows that following Plaintiff's complaint on July 18, 2005, Agoglia's sexual comments and physical contact toward her continued and included two incidents of swatting her buttocks, blowing in her ear, telling her about several hot, naked blonde women that he had thought were Plaintiff at a bachelor party he had attended, and ultimately escalating to the September 2005 incident where Defendant placed an unlit cigar down her blouse and Plaintiff reported such conduct to the Police.

Aside from allegedly advising Plaintiff to avoid Agoglia, a jury could reasonably conclude that Bello did nothing more in response to learning of Defendant's actions until approximately two months later, when on September 28, 2005, Plaintiff wrote to Bello inquiring into what if any actions had been taken to end Agoglia's continued sexual misconduct towards her. The record indicates that it was only then that Bello delivered the letter to Spaventa, one of the two persons listed to report such conduct in the Handbook. It is significant that while Alliance's sexual harassment policy instructs sexual harassment victims how to report improper conduct, the policy also makes clear that a supervisor to whom sexual harassment is reported had a duty to immediately advise the Human Resources Manager or the VP of National Operations

so it can be investigated in a timely manner. The record here shows that approximately two months passed between Plaintiff's initial complaints to Bello and Bello's report of the conduct to Spaventa. Accordingly, a jury could reasonably find that Bello's response to Plaintiff's complaint was negligent.

Finally, although Spaventa quickly took action after Plaintiff's September 28, 2005 letter was delivered to her by Bello, a jury could find that the two month gap between the initial report to Bello and Alliance's actions to immediately remove Plaintiff from the receptionist's main desk and have Agoglia apologize to Plaintiff, did not constitute "immediate and appropriate remedial action." *Richardson*, 180 F.3d at 441; *see, e.g., McArdle*, 2009 WL 755287, at *10 (finding a supervisor's inaction and a ten-day gap in response to employee's formal complaint demonstrated that the hospital may not have taken "immediate and appropriate remedial action").

In summary, the Court cannot conclude as a matter of law that Alliance should not be held liable for Agoglia's conduct. Accordingly, Defendant's motion for summary judgment on Plaintiff's hostile work environment claim pursuant to § 296(6) is denied.

### *(2)    Retaliation*

Defendant seeks summary judgment with respect to Plaintiff's retaliation claim pursuant to § 296(6) on the basis that Plaintiff cannot demonstrate that she suffered an adverse employment action based upon her gender or that Agoglia had any role in the alleged retaliatory actions. In her opposition papers, Plaintiff fails to provide any response to these arguments.

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument

in any way." *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (citing

*Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases);

*accord Santiago v. City of New York*, No. 05-CV-3668 (RRM)(VVP), 2009 WL 935720, at *11

n.19 (E.D.N.Y. Mar. 31, 2009) (finding First Amendment retaliation claim abandoned by virtue

of plaintiff's failure to pursue such a claim in her opposition papers); *Sorto-Romero v. Delta Int'l*

*Machinery*, No. 05-CV-5172 (SJF)(AKT), 2007 WL 2816191, at *9 (E.D.N.Y. Sept. 24, 2007)

(finding claim "abandoned by virtue of his failure to address [it] in his memorandum responding

to defendant['s] summary judgment motion"); *Anti-Monopoly, Inc. v. Hasbro, Inc.,* 958 F. Supp.

895, 907 n. 11 (S.D.N.Y.) (finding plaintiff's failure to provide arguments in opposition to

defendant's motion "provides an independent basis for dismissal" and "constitutes abandonment

of the issue"), *aff'd* 130 F.3d 1101 (2d Cir. 1997); *see Wecare Holdings, LLC v. Bedminster Int'l*

*Ltd.,* No. 08-CV-6213, 2009 WL 604877, at *8 (W.D.N.Y. Mar. 9, 2009) (granting summary

judgment based on failure to address arguments in opposition papers and deeming claims

abandoned); *Brodsky v. Trumbull Board of Educ.*, No. 3:06 CV 1947 (PCD), 2009 WL 230708,

at *9 (D. Conn. Jan. 30, 2009) (granting summary judgment in favor of defendants where

plaintiffs failed to address defendants' arguments with respect to plaintiffs' First Amendment

retaliation claim, malicious prosecution claim and statutory claim on the grounds that

"[p]laintiffs' failure to address [defendants'] arguments in their opposition papers constitutes

abandonment of the claims"); *Santiago v. Newburgh Enlarged City School Dist.*, 485 F. Supp. 2d

327, 338 (S.D.N.Y. 2007) (dismissing plaintiff's retaliation claim that she was terminated for

complaining about discrimination because she failed to address defendant's argument that

summary judgment should be granted in his favor on this claim); *Bellagar de Dussuau v.*

*Blockbuster, Inc.,* No. 03-CV-6614 (WHP), 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) (deeming claim abandoned based on plaintiff's failure to address claim in opposition to defendant's summary judgment motion); *see also* Local Civ. Rule 7.1 ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion. . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default.").

In the instant case, Defendant moved for summary judgment on Plaintiff's retaliation claim pursuant to § 296(6), but Plaintiff failed to address any of Defendant's arguments regarding this claim. The Court therefore deems Plaintiff's retaliation claim abandoned and grants summary judgment in favor of Defendant with respect to this claim.

## IV. *Plaintiff's Common Law Tort Claims Against Defendant Agoglia*

Defendant has moved for summary judgment on Plaintiff's common law causes of action for intentional infliction of emotional distress and assault. The Court shall address each claim in turn.

With regard to Plaintiff's claim for intentional infliction of emotional distress, Defendant's motion for summary judgment is granted and the claim is dismissed as Plaintiff cannot maintain said claim for the same conduct that serves as a basis for her claims of discrimination pursuant to the New York Human Rights Law. Under New York law, intentional infliction of emotional distress is a theory of recovery that is available "only as a last resort" and may not be maintained where the offending conduct is embraced by another tort remedy, including theories of sexual harassment under the Human Rights Law. *See McIntyre v. Manhattan Ford*, 256 A.D.2d 269, 270, 682 N.Y.S.2d 167, 169 (1st Dept. 1998); *Conde v.*

*Yeshiva Univ.*, 16 A.D.3d 185, 187, 792 N.Y.S.2d 387, 389 (1st Dept. 2005); *see, e.g., Caronia v. Hustedt Chevrolet,* Civil Action No. 05-3526 (DRH) (MLO), 2009 WL 909729, at *11 (E.D.N.Y. Apr. 1, 2009).  Accordingly, Defendant's motion for summary judgment on Plaintiff's common law cause of action for intentional infliction of emotional distress is granted.

Defendant seeks summary judgment on Plaintiff's cause of action for assault[16] arguing as a threshold matter that some of the alleged acts constituting the assault may be barred by New York's one year statute of limitations for intentional torts, N.Y. CPLR 215(3). Defendant's argument is without merit.   Under subdivision 8(a) of N.Y. CPLR 215:

> Whenever it is shown that a criminal action against the same defendant has been commenced with respect to the event or occurrence from which a claim governed by this section arises, the plaintiff shall have at least one year from the termination of the criminal action as defined in section 1.20 of the criminal procedure law which to commence the civil action, notwithstanding that the time in which to commence such action has already expired or has less than a year remaining.

In turn, N.Y. C.P.L. 1.20(16)(c) provides that "[a] criminal action terminates with the imposition of sentence or some other final disposition in a criminal court of the last accusatory instrument filed in the case."  *See Dynamic Chemicals, Inc. v. Ackerman Mechanical Servs., Inc.,* 58 A.D.3d 153, 156, 867 N.Y.S.2d 820, 822 (4th Dept. 2008).

It is undisputed that Plaintiff filed a criminal complaint against Agoglia on September 28, 2005 in the First District Court Nassau County for numerous crimes based on his purported conduct which commenced in October 2004, which was still pending against him as of

---

[16]Although in her opposition papers, Plaintiff refers to this claim as a "cause of action for an assault and battery," the Complaint only alleges a cause of action for "common law assault." *Compare* Pl.'s Mem. of Law in Opp., at 19-22 *with* Compl., ¶¶ 36-38.  Accordingly, the Court solely addresses her claim for common law assault.

the time the instant summary judgment motion was made. It is further undisputed that the alleged discriminatory conduct underlying the criminal complaint is the same conduct that is the subject of Plaintiff's civil complaint against Defendant. Hence, all of the alleged acts that are the subject of the criminal proceeding and which also constitute the assault claim in this action are not time-barred and may be considered.

To succeed on an assault action under New York law, "a plaintiff must establish that a defendant intentional[ly] plac[ed] . . . another person in fear of imminent harmful or offensive contact." *Sheikh v. City of New York,* Nos. 03-CV-6326 (NGG), 05-CV-4718 (NGG), 2008 WL 5146645, at *13 (E.D.N.Y. Dec. 5, 2008) (internal quotation marks and citation omitted). Physical injury is not required. *See Hassan v. Marriott Corp.,* 243 A.D.2d 406, 407, 663 N.Y.S.2d 558, 559 (1ˢᵗ Dep't 1997) ("[P]hysical injury need not be present for an assault").

Plaintiff asserts that Agoglia committed an assault against her when he allegedly gestured as if he were going to grab her breast, approached her to smack her multiple times on her buttocks, and approached her (i) to place a cigar down her shirt, (ii) to smack her buttocks on numerous occasions, (iii) to blow in her ear, and (iv) to rub her shoulders, all without her consent. Defendant argues principally that Plaintiff does not allege facts sufficient to withstand summary judgment. The Court disagrees with Defendant.

Plaintiff has raised a triable issue of material fact regarding whether Agoglia's conduct amounts to an intentional attempt to commit an assault upon her. Accordingly, the Court declines to grant Defendant summary judgment on Plaintiff's assault cause of action.

**CONCLUSION**

For all of the reasons set forth above, Defendant's motion for summary judgment is decided as follows: summary judgment is granted as to Plaintiff's Title VII claims; summary judgment is denied as to Plaintiff's hostile work environment claim pursuant to NYSHRL § 296(6); summary judgment is granted as to Plaintiff's retaliation claim pursuant to NYSHRL § 296(6); summary judgment is granted as to Plaintiff's common law cause of action for intentional infliction of emotional distress; and summary judgment is denied as to Plaintiff's common law cause of action for assault.

**SO ORDERED.**

Dated: Central Islip, New York
      September 3, 2009
                                               _____/s/_____
                                               Denis R. Hurley
                                               Unites States District Judge